UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JAIME KEELING,

                    Plaintiff,

          v.

NEW ROCK THEATER PRODUCTIONS,
LLC, EVE HARS, and ETHAN GARBER,

                    Defendants.

---

10 Civ. 9345

**OPINION**

This is a copyright dispute between plaintiff Jaime Keeling and defendants Eve Hars, Ethan Garber, and their production company, New Rock Theater Productions, LLC.  The work at issue is a theater production called *Point Break LIVE!*

A jury trial was concluded in this case on December 7, 2012.  The jury found in Keeling's favor, concluding that

- Keeling is the sole-owner of *Point Break LIVE!*

- *Point Break LIVE!* was a parody, and thus made fair use of the film *Point Break*

- All three defendants infringed Keeling's copyright (though not willfully)

- Keeling suffered $50,000 in actual damages

- Defendants' profits over five years of infringing activity totaled $200,000[1]

---

[1] 17 U.S.C. § 540(b) provides that the amount awarded for actual damages must not be counted a second time in determining defendants' profits.  Thus, the total damage award under § 504 will typically be equal to actual damages added to the difference between actual damages and profits.  Accordingly, the jury in this case was instructed to

1

The Copyright Act provides that a copyright holder is entitled to recover both her actual damages and all of the profit earned from the infringing activity.  17 U.S.C. § 504. Accordingly, judgment was entered in Keeling's favor on January 10, 2013 in the amount of $250,000.

Ethan Garber now moves for a new trial or remittitur on damages, amendment to the judgment on the issue of Garber's joint liability, and a new trial on vicarious liability.

Garber's motions are denied in every respect but one.  A new trial will be held to determine whether Garber eventually made a genuine attempt to stop New Rock's infringing productions of *Point Break LIVE!*  And if so, when did this occur, and what percentage of defendants' profits was earned after that point?

## Damages

<u>Legal Standard</u>

The court may set aside a jury's verdict and grant a new trial if the jury's decision is against the weight of the evidence and is either seriously erroneous or a miscarriage of justice.  The court may engage in its own weighing of the evidence and its own assessment of witnesses' credibility but should only disturb the jury's verdict when it was "egregious"

---

subtract the amount they had arrived at for actual damages, if any, from their determination of defendants' profits. The $200,000 figure indicated by the jury when it delivered its verdict therefore reflects its determination that defendants' profits were actually $250,000 but reduced this figure by the $50,000 awarded in actual damages. <u>See</u> Tr. 677:11-14.

and, should only rarely substitute its own judgment of a witness' credibility for the jury's. Raedle v. Credit Agricole Indosuez, 670 F.3d 411, 418 (2d Cir. 2012) cert. denied, 133 S. Ct. 789, 184 L. Ed. 2d 582 (U.S. 2012).

Garber's alternative proposal, conditional remittitur, is subject to a similarly high standard.  Where a jury's award was not caused by any specific, discernible error, conditional remittitur is appropriate only when 'the award is so high as to shock the judicial conscience and constitute a denial of justice.'  Lore v. City of Syracuse, 670 F.3d 127, 177 (2d Cir. 2012).  If a jury's award meets this standard, it should only be reduced to the maximum amount that the court would uphold as not excessive.  Id. at 180.

Here the issue is the jury's calculation of Keeling's damages, which consists of two components — actual damages and profits.  See 17 U.S.C. § 504(b).  Garber challenges the jury's determination of both Keeling's actual damages and its determination of Hars's profit from the infringing activity.

A copyright holder's actual damages are typically conceived of as a reasonable royalty or license fee.  This is designed to reflect the amount that the copyright holder could have received had she and the infringer negotiated and reached an agreement to allow the infringer to use the copyrighted materials legally.  It is important to note that, to prevent abuse, this amount is to reflect an objective fair market value for the work, not the amount the copyright holder might actually have demanded.  See On Davis v. The Gap Inc., 246 F.3d 152,165-167 (2d Cir. 2001).

A copyright holder is also entitled to disgorgement of the infringer's profits from the infringing activity.  In calculating profits, the Copyright Act provides that the copyright holder need prove only the infringer's gross revenue.  It is up to the infringer to then prove her offsetting expenses.  17 U.S.C. § 504(b).  If the infringer's evidence leaves any doubt of her offsetting expenses and, thus, profit, those doubts must be resolved in the copyright holder's favor and against the infringer.  In Design v. K-Mart Apparel Corp., 13 F.3d 559, 564 (2d Cir. 1994); Gaste v. Kaiserman, 863 F.2d 1061, 1070 (2d Cir. 1988).

## ACTUAL DAMAGES

The parties appear to agree that the evidence supports the jury's determination that a reasonable royalty for Keeling's work could come in the form of a percentage of gross profits.  Given that defendants' undisputed profits were approximately $1 million, and the jury awarded $50,000 in actual damages, it is apparent that the jury concluded that a reasonable royalty would have been 5%.  The question is simply whether the evidence supports this conclusion, or whether, as Garber urges, 2.5% would be the highest reasonable rate.

The 5% figure is supported by at least two pieces of evidence.  First, it was undisputed at trial that Keeling and defendants had actually entered into an agreement that allowed defendants to use Keeling's intellectual property.  That agreement permitted use of the same work and in the same manner as the infringing activity, though it covered only a single production.  It provided a royalty rate of $1,500 or 5% (whichever was greater) with an

option to renew.  Second, Keeling testified that, in preparing the license agreement just described, she conducted research and found that 5% was a reasonable rate.

In support of the 2.5% rate, Garber turns to another agreement entered into between defendants and Chris Taylor, owner of the rights to the film *Point Break* from which *Point Break LIVE!* was derived.  The evidence at trial showed that this agreement allowed defendants to make use of the film *Point Break* on an unlimited basis in exchange for a royalty rate of 2.5% of gross revenue and $15,000 paid up front.

Garber contends that this latter agreement was more representative of the true objective value of Keeling's work because, unlike the Keeling agreement, it was not limited to a specific time and venue and it was the product of more formal and sophisticated negotiations than those that took place between Keeling and defendants.  Keeling points out, however, that this agreement does not cover the same work.  The Taylor agreement allowed defendants to use the film from which *Point Break LIVE!* was derived but any hypothetical agreement with Keeling would have covered the script of *Point Break LIVE!* itself.  The Keeling agreement, on the other hand, actually covered the work at issue.

Given this difference, it is difficult to say with any certainty that the Taylor agreement was better evidence of a reasonable royalty.  Much less can one conclude that the jury's apparent decision to follow the 5% rate set in the Keeling agreement is "seriously erroneous," that it is a "miscarriage of justice," or that it "shocks the judicial conscience."

Therefore, the jury's award of $50,000 in actual damages should not be disturbed.

PROFITS

The jury found that defendants were able to generate $250,000 in profits on undisputed gross revenues of approximately $1 million through their infringing productions of *Point Break LIVE!*  Garber argues, however, that the evidence shows that defendants' profits did not exceed $25,498.

Because it is undisputed that defendants' gross revenue was roughly $1 million, the problem in determining defendants' profits is simply one of interpreting the evidence of their expenses.  It was defendants' burden at trial to prove their expenses to the jury and they did so primarily through Hars's testimony and through the introduction of her 2008-2011 tax returns.  Records from defendants' ticketing provider, OvationTix, are also of some use since they show defendants' gross revenue for each show.

*HARS'S TAX RETURNS*

The tax returns introduced at trial show that Hars reported business income of $25,498.  That figure is arrived at by adding the values in line 12 on form 1040 of Hars's 2008 – 2011 federal tax returns.  Def. Ex. 2.  It does not include her 2007 return which, while this return was also introduced into evidence, covers the year prior to the period covered by the jury's damages calculation – the jury was asked only for Keeling's damages from January 1, 2008 through the present.  It also does not include Hars's 2012 income because the tax year 2012 had not concluded at the time of the trial and therefore, presumably, Hars had not yet prepared her 2012 return.

6

Other than not covering one of the years at issue, 2012, there are two other potential problems with the returns as evidence.

First, the signature on each return is dated August 24, 2012, only three months before trial and 21 months after litigation began (and, of course, many years after most of them were due).  It was suggested at trial, and the jury may have agreed, that the returns might have been fraudulently prepared for the purposes of the lawsuit, and not in the normal course of Hars's business.  Hars, however, testified that the delay was only because she is a "flaky artist and not a business person."  She testified that they were prepared by a Certified Public Accountant and that they were based on her own meticulously maintained accounting documents.  Tr. 492:6-17.

Second, these are only the returns filed by Hars, but Hars is only one of three defendants in the lawsuit.  The returns have little to say about whether Ethan Garber received any profits or whether there were any profits collected by New Rock that were not distributed to Hars or Garber.  It is true that Hars's returns appear to have been prepared as though New Rock was a sole proprietorship, but there was substantial evidence at trial — which, evidently, the jury credited — to indicate that New Rock was actually a limited liability corporation owned by Hars, Garber, and their attorney Gabriel Fischbarg.  Indeed, the full name of the company is listed on Hars's tax forms as "New Rock Theater Productions LLC."  If the jury believed that New Rock had many owners, it may not have believed that Hars's tax returns provided a complete picture of defendants' profits.  There

was no testimony at trial to aid the jury or the court in interpreting the tax returns in light of these questions.

## HARS'S TRIAL TESTIMONY

The general thrust of Hars's testimony was that she received very little profit from productions of *Point Break LIVE!*.  She testified that most of what she earned she "put back into the company" so that it could build up capital for future productions.  She testified that she kept only $5,000 for herself which she was able to live off of only because she had received a small inheritance and had few living expenses. Tr. at 497:7-12.

As well as testifying generally about her earnings, Hars also attempted to characterize the profits and losses of specific shows.  She testified that in the fall, 2007 the Los Angeles production earned a profit of between $10,000 and $20,000. Tr. 500:7-9.  The San Francisco production in March 2008, she testified, turned a $40,000 profit.  Tr. 498:6-7.  They lost virtually all of that money in the Las Vegas production, however.  The Las Vegas production, Hars testified, lost $80,000.  Tr. 501:7-9.  The production then moved back to Los Angeles "with its tail between its legs."  That production eventually "eked back" $15,000 profit, enough to finance the show's return to San Francisco in June of 2009.  Tr. 502:14-17.

That San Francisco production, Hars testified, got close to earning back the $15,000 invested in it from the proceeds of the Los Angeles show, but ultimately lost a few thousand dollars.  Tr. 503:8-9, 505:9-13, 507:7-10.  She testified that the show lost money

between June 2009 and June 2010, but she did not specify which production she was referring to. She then took the show to Chicago. Staging that production cost $70,000 but the production only earned $60,000. Thus, the Chicago show lost $10,000. Tr. 510:5-22. In addition, it was at that point that New Rock and Hars were asked to repay a $30,000 loan made by Garber. The show continued to run in Los Angeles through the end of 2010 but made no money. Tr. 511:10-512:11. Hars testified that she then put on a new production in March of 2011. She testified that the show cost $6,000 to put on, which it made back, but that as of December, 2012 there was only $800 in the bank account. Tr. 514:21-515:19.

Hars also testified that, at the Las Vegas show, she was approached by Chris Taylor, with whom she executed an agreement for the rights to the film *Point Break*. That agreement, she testified, cost her $20,000 in legal fees, a $15,000 up-front fee, and 25% of her subsequent profits. She did not say, however, whether these amounts are accounted for in the other figures she provided in her testimony.

While Hars's tax returns and certain parts of her trial testimony, e.g. Tr. at 497:7-12, indicate that the show produced a profit of approximately $25,000 over five years, this more detailed testimony suggests that New Rock actually lost between $5,000 and $30,000 dollars. But such conclusions cannot reliably be drawn from Hars's testimony because, while she did provide the figures described above at trial, she also made quite clear that they were probably not accurate. She repeatedly objected to being questioned about the profits of particular shows, saying that she was not prepared to answer such questions and

emphasizing that they might not be accurate.  See, e.g., Tr. at 499:5-11, 500:7-1, 12-14, 18-20, 505:19-506:1.

### THE OVATIONTIX REPORTS

The OvationTix reports are of little use beyond reliably establishing New Rock's minimum gross revenue — it is only the minimum gross revenue because these reports do not include productions in the second half of 2012, the Louisville production, or tickets sold at the door.  However, they do provide a few points of comparison for Hars's trial testimony.  Overall, a comparison of Hars's testimony to the OvationTix reports suggests that one ought to take seriously Hars's cautionary remarks about the accuracy of her testimony.  On every point of comparison, Hars's testimony appears to have dramatically underestimated the production's revenue.

Because the OvationTix reports only provide evidence of the production's revenue, they can only be usefully compared to testimony by Hars that states or implies a certain amount of revenue for particular shows.  She did so on three occasions, in describing the June 2009 San Francisco Show, 2010 Chicago show, and an unspecified March 2011 show.

Of the June 2009 San Francisco show, Hars testified that it fell a few thousand dollars short of earning back the $15,000 that it cost to stage the production.  This implies that revenue for the show was less than $15,000.  Tr. 502:14-17, 503:8-9, 505:9-13, 507:7-10.  But OvationTix reports tell a different story.  The first surprise is that the report discloses two different San Francisco productions of *Point Break LIVE!* in 2009, one at a theater

10

called CellSpace, and another at Metreon. Hars's testimony seems only to discuss one. And while the report does not indicate when exactly in the year 2009 these productions were staged, both of them earned revenue well in excess of $15,000. The Metreon show grossed $44,475. The CellSpace show grossed $55,868.91. Pl. Ex. 85 at T0002-03.

Hars also estimated that the 2010 Chicago show earned only $60,000. Tr. 510:5-22. But, again, the OvationTix reports tell a different story. A production called "Point Break LIVE! Chicago" is listed as having grossed $89,328.85 in the year 2010. The report also indicates that this production continued into the next year. It grossed another $17,276.92 in 2011. In total, "Point Break LIVE! Chicago" grossed $106,605.77, not $60,000. Pl. Ex. 85 at T0003-04.

Finally, Hars testified that she put on a new production in March of 2011 which, while it earned back the $6,000 it cost to put on, as of December, 2012 there was only $800 left in the bank account. Tr. 514:21-515:19. This seems to imply that the March 2011 production made not much more than $6,800. The OvationTix reports indicate that there were two productions that ran in 2011: "Point Break LIVE! Chicago" and "Point Break LIVE! LA." Hars did not indicate which production she was referring to when she said that she restarted the show in 2011. However, given that the Chicago production appears to be a continuation of the 2010 show, and her testimony suggests that she was based in Los Angeles at the time, it seems reasonable to conclude that she was referring to a Los Angeles performance, not the one in Chicago. Gross revenue for this show was $66,342.24, well in excess of $6,800. Pl. Ex. 85 at T0013-14.

11

It is possible, of course, that the court (or the jury, if indeed it pursued this line of reasoning) has misunderstood the OvationTix reports in some way.  However, in the absence of any explanatory testimony from Hars or anybody else at trial, these are not unreasonable conclusions to draw from the reports given the record developed.  This is particularly the case given that it was defendants' burden to prove their offsetting expenses at trial.  These three apparent discrepancies alone could account for approximately $180,000 of the difference between the roughly $25,000 that Hars admitted to earning, and the jury's award of $250,000.

### DISCUSSION

It was uncontroverted at trial that defendants' gross revenues were slightly in excess of $1 million.  And there was some evidence developed at trial that supports defendants' contention that their expenses were so high that only $25,000 remained, in total, over five years of infringing productions.  This figure is supported to some degree by Hars's testimony and her tax returns.

It is clear from the verdict, however, that the jury did not find this evidence credible. And given Hars's own concessions in her trial testimony, as well as the issues with the tax returns described above, it is difficult to fault the jury for declining to take this evidence at face value.

But this does not settle the question of what would constitute an "egregious" jury verdict in light of the evidence — there is a limit to how deeply the jury could reasonably

have disbelieved defendants' testimony.  Had the jury concluded that, contrary to defendants' evidence, defendants had incurred no expenses at all, or only one or two hundred thousand dollars over five years, it would be clear that the court should vacate the verdict on damages.  There is simply no support for so deep a skepticism of the defendants' evidence.

Because the question facing the court is not binary but a matter of degree, plaintiff's insistence that it was defendants' burden to prove their profits, though indisputably correct, is of little help.  Regardless of the burden, the court's task remains simply to determine whether the substance of the jury's factual conclusion was fair and just in light of the evidence.  Here that means evaluating whether the jury could have been justified in concluding that defendants expenses were actually about $225,000 over five years, or roughly %23, lower than defendants' evidence seemed to indicate.

But given the serious — and conceded — unreliability of Hars's testimony, and the legitimate reasons to doubt the evidentiary value of her tax returns, the court concludes that the jury's determination was neither egregious, nor shocks the conscience and, therefore, defendants' motion for remittitur or a new trial is denied.

The court has already discussed the evidence in some detail, and the jury's potential reasons for discrediting it.  Those defects notwithstanding, however, it remains clear that there is little reason to doubt Hars's general contention that *Point Break Live!* never became a very lucrative enterprise.  While the production did earn more than $1 million in gross revenue, Hars's testimony that a great deal of that revenue was absorbed by payments

to actors, venue owners, and other sundry expenses was very believable.  A jury verdict that concluded that Hars and the other defendants profited extravagantly from the productions would be quite unjustified.  But the jury's actual verdict was more restrained.  Its verdict that the show earned a total profit of $50,000 per year is not badly out of correspondence with the general proposition established by Hars's testimony that the production was not very lucrative.

   This figure is made even more defensible by the fact that the evidence at trial focused almost exclusively on Hars's personal income from the *Point Break LIVE!* productions. Virtually no evidence, meanwhile, was introduced to address potential payments to the other investors and owners of *Point Break LIVE!*, money retained by New Rock but not paid out to anyone, or the proper classification of revenue that was reinvested in future shows. Hars testified, for example, that while the show earned at least $50,000 in its first Los Angeles and San Francisco productions, all this money was lost through a combination of bad luck and recklessness in staging the Las Vegas production.  Plaintiff suggested to the jury, for example, that it might not be appropriate to deduct this and other amounts as expenses for the purposes of calculating defendants' profits.  It is a question for the jury whether a given overhead expense is creditable against the infringer's revenue, See e.g., Wilkie v. Santly Bros., 139 F.2d 264, 265 (2d Cir. 1943), and a question on which defendant bears the burden persuasion.  The jury, therefore, may have accepted plaintiff's invitation.  Similarly, Hars testified that she reinvested most of her earnings into the company.  The jury might have concluded that this constituted profit whether or not Hars

chose to reinvest it (though no evidence was introduced at trial to establish the amounts of those reinvestments).

In light of all these uncertainties in defendants' evidence, and the very great deference the court must afford the jury's credibility determinations, the court cannot conclude that the jury's conclusion that defendants' earned a profit of $250,000 over five years was egregious or that it shocks the judicial conscience.  Accordingly, defendants' motion for remittitur or a new trial on damages is denied.

## Garber's Vicarious Liability

### LEGAL STANDARD

Garber moves for a new trial on his vicarious liability for New Rock and Hars's infringement of Keeling's copyright.  As with a new trial on damages, above, the motion should be granted if the jury's decision is against the weight of the evidence and is either seriously erroneous or a miscarriage of justice.  Raedle, 670 F.3d at 418.

A party becomes vicariously liable for another's direct copyright infringement by "profiting from direct infringement while declining to exercise a right to stop or limit it." Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd., 545 U.S. 913, 930, 125 S. Ct. 2764, 2776, 162 L. Ed. 2d 781 (2005).

GARBER'S FINANCIAL INTEREST IN NEW ROCK

At trial, substantial evidence was introduced to show that, contrary to Hars and Garbers' assertions, Garber was a party to the operating agreement of New Rock , that this agreement provided that Garber owned 40% of the LLC, and that, accordingly, he would be entitled to 40% of its profits.  Deposition testimony was introduced in which Hars admitted to telling others that Garber was a partial owner, though she testified that these statements were untrue.  Keeling also introduced emails sent by both Hars and Garber that tended to indicate that they believed the operating agreement had been executed.  Finally, one of Keeling's witnesses, Thomas Blake, testified that both Hars and Garber told him that Garber was a partial owner of the company.  Tr. 348:9-18.

Defendants, on the other hand, offered some testimony to rebut Keeling's evidence but, evidently, the jury was not swayed.  Hars testified, on the one hand, that she told others that the agreement was in place because it was a convenient way of lending credibility to her decisions and diffusing what would otherwise be her own responsibility for them.  See Tr. 540:4-7.  But she also testified that she actually believed that the agreement existed and had been in effect.  See Tr. 539:15-540:21.

Garber also provided an explanation for the confusion surrounding the operating agreement.  He testified that he believed for some time that the operating agreement had been executed.  But he later learned otherwise when, in connection with this lawsuit, Garber asked Fischbarg, New Rock's attorney, for a copy of the executed operating agreement.  Fischbarg, who was to own 10% of New Rock under the agreement in

16

exchange for his legal services, then disclosed that he had never signed it.  <u>See</u> Tr. 446:4-13.

It was never disputed that, had the agreement been effect, Garber would have owned 40% of New Rock and eventually been entitled to 40% of New Rock's profits.

Given this confusing and conflicting evidence, the jury's apparent conclusion that Garber did, indeed, have a financial interest in New Rock's infringing productions of *Point Break LIVE!* was reasonable and supported by the evidence.  The jury was faced with a concrete factual question — did Garber come to own a 40% stake in New Rock? — which depended on the jury's assessment of Hars and Garber's credibility as witnesses.  The jury evidently concluded that their testimony was not credible.  This decision was both supported by the evidence just described and, moreover, is entitled to considerable deference. <u>Raedle</u>, 670 F.3d at 418.


## GARBER'S RIGHT AND ABILITY TO CONTROL THE INFRINGING CONDUCT

An analysis of the jury's evident decision that Garber also had the ability to supervise or control New Rock's infringing activities must start with the premise that, in the jury's view, Garber actually owned 40% of New Rock.  The jury's common sense would have suggested that, in a typical business arrangement, the owner of so large a portion of a company could likely wield considerable influence over the company's operations, if he chose to do so.

Against this backdrop, Keeling introduced emails evidencing multiple cases where Garber asked Hars to take a particular action in her management of New Rock, and Hars did as he asked.  On one occasion Garber asked Hars to verify that Keeling was indeed the creator of the work by finding one or two people who could corroborate Keeling's story. Hars did. Pl. Ex. 17. More significantly, however, the emails suggested that it was actually Garber and Fischbarg who objected to the terms of New Rock's short-lived licensing agreement with Keeling and pressured Hars to either renegotiate for a lower royalty or to stage productions without Keeling's permission.  Pl. Ex. 18. Garber's trial testimony appears to confirm this suggestion. Tr. 420:8-25.  Furthermore, Garber emailed Hars, Fischbarg, and Blake to point out that, though it was possible that Keeling's legal position might have some merit, this was a risk they could take since Keeling was the "impoverished vulnerable one" — he suggested that New Rock could out-litigate Keeling since the operating agreement provided that Fischbarg would defend New Rock for free while Keeling would need to pay legal fees. Pl. Ex. 50.

On many other occasions, Hars either told others that Garber's approval was necessary for certain business decisions or Garber held himself out at a decision-maker for New Rock.  See, e.g., Tr. 422:5-423:1, 433:12-434:18, 541:9-13; Pl. Ex. 62, 70.

Garber emphasizes the many aspects of New Rock's business that Garber did not participate in — he made no creative decisions, he made no productions decisions, he did not control its finances — and a few occasions on which Hars appears not to have acted in accordance with Garber's wishes.  In particular, Hars entered into the initial agreement

with Keeling over Garber's apparent objection, Tr. 113:6-10, 419:12-20, and Hars disregarded Garber's request that some money be set aside from the proceeds of *Point Break LIVE!* to compensate its creators in the absence of a license agreement.  Pl. Ex. 84. Garber also testified about one occasion when, due to this lawsuit, he asked Hars to stop putting on productions of the show, but she refused.  Tr. 440:4-11.  He also describes steps he took on the eve of trial and after the trial's conclusion to stop Hars from staging additional performances, but none of this evidence was presented to the jury (indeed, Garber's declaration to this effect was filed after the trial had already concluded).

Given this conflicting morass of evidence, the jury's conclusion was that Garber had the right and ability to put an end to New Rock's infringing activities, at least at the time the infringing performances began and for some time after, was not egregious.  That Hars did not hew to Garber's wishes in every decision she made does not establish that Garber did not, generally speaking, have the right and ability to stop the infringing behavior.  Indeed, there is substantial evidence that Garber actually caused the infringing behavior.

But, as described above, there came a time when, according to Garber's testimony, Garber asked Hars to stop staging infringing productions of *Point Break LIVE!,* in an effort to limit his potential personal liability.  This testimony was uncontroverted at trial and, given Garber's explanation for the request, seems highly credible.  Hars, however, disregarded the request and continued staging productions through the end of 2012.

The special verdict form submitted to the jury asked the jurors the yes-or-no question whether Garber infringed Keeling's copyright.  It did not provide them with the

opportunity to address the more nuanced question of whether Garber's control over the production might have changed over time.  The jury answered "yes" to the yes-or-no question, and a judgment was entered that provided for Garber's joint liability for the entirety of the damage award.  Thus, the implicit conclusion was that Garber exerted the requisite level of control over New Rock and Hars's actions throughout the entire five year period at issue in the trial.  See Fed. R. Civ. P. 49(a)(3).

This presents the opposite of the situation described above.  Just as it is incredible to conclude that Garber did not exercise the requisite level of control over infringing behavior that he himself appears to have caused, it is equally incredible to conclude that he maintained this control beyond the moment when he actually tried to stop the infringement, but failed.  The jury's implicit conclusion to the contrary — that Garber controlled Hars and New Rock for the entire period covered by the lawsuit — was, therefore, seriously erroneous, such that a new trial is appropriate on the issue.  The trial, however, should focus on the following extremely narrow question.  Did there come a time when Garber made a genuine attempt to stop New Rock's infringing productions of *Point Break LIVE!*?  If so, when did this occur, and what percentage of defendants' profits was earned after that moment?  This portion of the profits must be deducted from the amount for which Garber is jointly liable.

### Garber's Joint Liability

Garber moves to amend the judgment to eliminate his joint liability for the profits component of the damage award.  While the Copyright Act provides that co-defendants in a copyright suit may be jointly liable for damages, it does not provide for joint liability for profits, except under certain limited circumstances.  Abeshouse v. Ultragraphics, Inc., 754 F.2d 467, 472 (2d Cir. 1985).  One recognized exception, relevant here, is that co-defendants may be jointly liable if they are "engaged in a partnership, joint venture, or similar enterprise." Id.  The judgment entered in this case, however, provides that Garber is jointly liable for the entire amount of the damage award, the bulk of which is for disgorgement of illegal profits.

The court may amend its judgment to correct a clear error or to prevent a manifest injustice. Munafo v. Metro. Transp. Auth., 381 F.3d 99, 105 (2d Cir. 2004).

Garber's argument on this point, however, suffers from two severe defects: it was never raised at trial for submission to the jury, and was not raised before entry of the judgment.

When a party fails to raise an issue for submission to the jury, the court makes no finding on the issue, and the jury returns a special verdict — as occurred in this case — the party is deemed to have waived the issue and the court is considered to have made a finding consistent with its judgment on the jury's special verdict.  Fed. R. Civ. P. 49(a)(3). Thus, because the judgment on the special verdict held Garber jointly liable with his co-defendants, the court is deemed to have properly made a finding that Garber was "engaged in a partnership, joint venture, or similar enterprise" with his co-defendants.

And there is nothing incredible about this substantive conclusion. The jury reasonably concluded that Garber was a 40% owner of his co-defendant New Rock alongside his other co-defendant Hars, who owned 50%. It is eminently fair to say that a defendant who is a 40% member of an LLC is engaged in an enterprise similar to a partnership or joint venture with his co-defendants, when those co-defendants are the majority co-owner of that LLC and the LLC itself. Accordingly, there is no error in the court's implicit finding that Garber was engaged in a "similar enterprise" to a partnership and, thus, was jointly liable for his co-defendants' profits.

Equally and independently fatal to Garber's argument is his failure to raise it before entry of the judgment. A motion to amend the judgment may not be used to raise new arguments that could have been made before the judgment was entered. Bonded Concrete, Inc. v. D.A. Collins Constr. Co., 29 F. App'x 725, 726 (2d Cir. 2002).

## Conclusion

Garber's motions are denied in every respect but one. A new trial will be held to determine whether Garber eventually made a genuine attempt to stop New Rock's infringing productions of *Point Break LIVE!* If so, when did this occur, and what percentage of defendants' profits was earned after that moment?

Dated:  New York, New York
         May 23, 2013

_____
Thomas P. Griesa
United States District Judge

22

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: May 23, 2013